Argument next in number 2010-14-21, HAKO-MED v. AXIOM WORLDWIDE. Before we begin with this case, I wanted to announce that at the conclusion of the argument in this case, we will take a 10-minute recess for purposes of reconstituting the panel. Thank you. I'll let people exit the courtroom, Mr. Rappel. Is it Rappel or Rappel? Yes, sir. Rappel. Rappel. Very good. Very well. Why don't you proceed when you're ready. Thank you. Please, the court. Good morning. This case raises basically the issue of whether where a jury in a patent matter, viewing a patent that can only be viewed in an oscilloscope, has the province to make a determination of the fact that's needed within the record to determine whether there's a violation of the patent through the adoption of the equivalents. In this case, we submit that the court viewed the record not in light most favorable to the HAKO-MED entities. And why we submit to that is the fact that we placed within the appendix before the court the testimony of the inventor, Dr. Achim Hans-Juergens, who commenced through his testimony before the jury, explaining the steps of the patent, and then from there moved on to a demonstration. In that, through the demonstration, he even spoke to the jury about the in-synchronism and what he meant by the term of art in-synchronism within Limitation C of the 552 Patent Claim 1. Where is the particularized testimony with respect to equivalence on that limitation? Yes, that's a good point. What we've raised to the record, Your Honor, is in looking at Dr. Hans-Juergens' testimony, and that would be starting at, I believe, page 183 in the appendix. As we then proceed from there, that's lines 1 through 17. As we proceed through there, then at A of 186, lines 6 through 13, he discusses, with respect to the HAKO-MED device, the action potential issues. And then he proceeds at 187, at lines 15 to 23, he said, look here, that you can see, this is my patent, and in synchronism to this, we get action potentials. Because we get this, we just get the results. And then later, he said, when he looked at the Axiom device, he showed the jury, look here, here's the waveform. We have the two electrodes coupled to the circuit within the corner frequencies that we set on the device. Those are all conclusory statements and generalized statements. Where is the particularized testimony as to equivalence of the limitation in question? Well, he already, again, what we said is that he's already testified to that. He already said what he meant by his patent. And what he meant was that the action potentials arise in the treatment area. That was his position statement. It was the defense in this case that actually changed, basically changed the position of the case. Which limitation and which claim was not found to be literally in print? I need to focus a little bit. Right, I understand that. Can you point me in the patent which limitation was found not to exist literally, so therefore you were trying to establish equivalence? Well, all the limitations were found to be not literally. Which aspect? Well, the verdict form. The jury was asked in the verdict form whether it was infringed or not infringed. And the jury came back on the direct literal infringement. They said that there was no literal infringement here. What was missing? Is it the language, for example, in claim one where it says in order to generate in synchronism with the modulation frequency action? Is that the missing limitation? That's what the court, I believe, is claiming in this case. Let me back up for a second. That's what we believe that they've submitted on the record at the time that they went towards judgment as a matter of law under Rule 50A. My understanding is that they weren't pressing the issue with respect to any other limitation but that one. That's correct. And they were simply saying with respect to that limitation, there's no particularized testimony to establish an equivalence with respect to the generating synchronism limitation. I understand what the court's saying. That's also what they said on the direct side as well, direct literal. They conceded limitation A. They conceded limitation B at trial. And limitation C was all of this was what about was at trial. Because when we got down to it, they never testified about constant amplitude. That was never an issue before the jury. Middle frequency modulation, in other words, square waves, triangular waves. What this waveform was was never challenged by axiom in this case. And it got down basically to the difference of opinion between Dr. Feinberg, who testified in the defense side of the matter, that he felt that if I read Dr. Hans Juergens' patent correctly, I should see twitching in this case. Again, the testimony before the jury at that time was that all that means by that particular portion of limitation C. We were talking about, because he said, I don't understand when you're trying to pick the sentence apart. What he was saying is that what I'm saying there is that when you do microwave form, you're going to get the action potentials arising in that treatment area. That's what he testified to and showed the jury. That was his particularized statement in this matter. When we switched over to Dr. Feinberg. When you have particularized testimony as to why the accused device doesn't meet the generate and synchronism limitations, is that correct? That's correct, Judge Clevenger. That is correct. What Dr. Hans Juergens said is that the synchronism, if you read my patent, in the column, I believe it's column five, lines 52 to 65 of the patent. If you read the specifications, they're at the column. And at column six, 11 through 16, you would see what he meant about what synchronous with low frequency rhythm action potentials are generated. So he's saying, as me as a scientist, as me understanding my own art, and again, as we also raise the fact is, again, this is about an engineer. One skilled in the art is an engineer, not a biophysicist. And he's saying that, as I understand it, I do this waveform, I get action potentials that arise in the treatment area. That's what he explained to the jury. It was Dr. Feinberg who came in, again, under the defense of non-enablement. I couldn't build this device. I don't understand what they're talking about. Again, that it was indefinite was one of their other defenses. And then he tried to take the argument to the jury about the fact of what was meant literally. In his opinion, what was meant literally was that, if I read the patent correctly, it would be twitching. And what I see here is continuous muscle relaxation, follow, I'm sorry, continuous muscle contraction followed by relaxation followed by another contraction. And so our position, as we raised in the blue brief, is that what we're really arguing over is the quantity and quality of an action potential, not the fact that action potentials arise within the treatment area, which is what we submitted, was what the patent specification called for, what the jury understood in this case. They saw, again, the device that belonged to my client, the enabling device, which is normally a no-no, and that's allowed into the courtroom. And then they see the device of what we alleged to be the infringer. And again, so they've had one opportunity there with the plaintiff's side. Then they bring in their own device, again, with an oscilloscope, and the jury sees the same waveform. So, again, our position is, and this court, even though it's more on a Rule 50B issue, this court recently in Unilock said that we just don't allow judges to act as 13 jurors, as the 13th juror. In fact, we will allow the court in the new trial issue to take a look at the scenario, but certainly not under Rule 50B analysis here. So, again, we also raised the issue is the fact that the court felt there should be a function way result test. And, of course, as the court knows, there's a limitations, all limitations test. There's also specific exclusion. There could also be a disclaimer rule. Well, we don't see anything disclaimed other than amplitude. I would say amplitude modulation is certainly disclaimed and not constant amplitude. That device was capable of producing constant amplitude. Certainly, again, the specific exclusion rule there would be the fact that we're doing middle frequency modulation, so anything outside of middle frequency modulation would probably be explicitly excluded. Again, the jury saw that the Axiom device did that. So the only issue that we got down to was action potentials actually arising there, and the jury saw live demonstrations in the courtroom and saw what it saw. When Dr. Feinberg, Mr. Feinberg was asked in the case at the tail end of his testimony, he said that he felt that there was no difference in that demonstration between what he saw in the plaintiff's case in chief and what he did. And that's at the very end of what he said in his testimony at the time before the court. Additionally, on page… Was that testimony being offered to show literal infringement? Our position was offered for any infringement, non-infringement. It was offered to show non-infringement. They did not particularize whether it was for literal or it was against the doctrine of equivalence. There certainly was just a position of non-infringement. That's what they said, which turns basically… And that's the reason why we have the particularized testimony rule, is to, you know, allow us when we're reviewing up here on appeal what the jury may or may not have been able to conclude with regard to a pretty fuzzy doctrine, oh, well, it looks equivalent to me. You're supposed to put your markers down and say, well, here's a limitation that we, if the jury finds this one isn't met literally, we think it's met by equivalence and here's why. I understand that. You match up, you look at the accused device and you say, well, the accused device, if we lose on a literal infringement, it means it wasn't doing this exactly the way the claim calls for, but it's substantially the same or the same way to get the same result. So that if that kind of testimony surrounds the subject matter, then when it comes up to us, we can look at a record to see whether or not there was any evidence put in to support those assertions. Well, I agree. When we're looking at a black box, I mean, the purpose of that particularized testimony rule is to assist the reviewing court in being able to decide whether or not the jury correctly found infringement when otherwise you would peer into the black box. Yes, but also what I'm trying to say here, Your Honor, if when we look at the record and it's certainly not looking through sporadic weaving of sporadic witness testimony, but if you start off with even Dr. Feinberg's testimony at 204, he was asked in direct examination by defense counsel and he said, and just to be clear, the twitching in terms of figure 1B, as you said, those would correspond to small points on the bottom, the action potentials themselves. Answer, yes, the twitching would have been in essence synchronization with the modulation frequency. Answer, OK. And it was not. That's what Dr. Feinberg said. And then he said, and you said that you got instead a continuous generation of action potentials. Answer, yes. He says, is that the synchronism that's required by the claim? Answer, no, it's not. Well, we already have in the record the plaintiff saying what he actually meant by what that portion of limitation C meant, which is that if you do my waveform, action potentials arise in the treatment area. Not that I have to prove the quality and quantity of the synchronization of the action potentials with the middle frequency modulation. That's not what the inventor is saying here. That's what the defense is trying to tell the jury. So later when we found out with Scott Johnson, who is their engineer, if the court would look, and I think that's page 222 of the appendix, I went through the limitation by limitation of the claims with Mr. Johnson. 222 of the actual, at the bottom, app 222, or? Of the app 222, yes. App 222. Yes, sir. And I believe that starts at page six. That would be page six of the law pages. Yes. Yes. I apologize for that, but that's how. No, it saves us a lot of hefting. And so if the court goes through that testimony there, the court will see that I started in cross-examination before the jury. So we didn't have a black box. We actually did have a good understanding of what was arising here. And so, again, as we got down to it, our position is that there was sufficient evidence within the record. This jury was not lost at sea. This jury saw everything, understood the concepts between this patent. They were the best ones sitting there at home plate to make that call, whether there was safe or whether it was out. As we said, not the trial court in this case, unfortunately. Our position was the trial court. There's no evidence. There's no record. And as an officer of the court, I will submit the court did not come down from the bench to view the demonstration to see what was on the oscilloscope. And why do you think the jury found no literal infringement? Because I think it got into the issue. The court looks at what we had talked about in my blue brief, the word in synchronism. I think it threw off the jury. And even though I raised an issue as being the losing party, our position was maybe we should have a new trial. The court felt that we shouldn't have had the deduction of equivalence. Maybe we still have gotten a literal infringement. Maybe the jury wouldn't have felt split the baby. Maybe we would have had more time in that matter. That's it, Your Honor. Thank you. Thank you. Being no representation from the appellee, the case is submitted. As previously announced, we will take a ten-minute recess for purposes of reconstituting the panel. Thank you. All rise. The Honorable Court will take a short recess.